UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 16-334(1) (JNE/KMM)

UNITED STATES OF AMERICA,

        Plaintiff,

  v.

PAUL R. HANSMEIER,

        Defendant.

**GOVERNMENT'S OMNIBUS
RESPONSE TO DEFENDANT'S
PRETRIAL MOTIONS**

The United States of America, by and through its attorneys, Gregory G. Booker, Acting United States Attorney for the District of Minnesota, Benjamin F. Langner and David J. Maclaughlin, Assistant United States Attorneys, and Brian Levine, U.S. Department of Justice Senior Counsel, submits this memorandum in response to defendant Paul Hansmeier's various pretrial motions.

**1.**    **Motions for Discovery and Inspection Pursuant to Rule 16** (Doc. Nos. 51, 52)

Defendant moves the court for an order requiring the government to provide discovery pursuant to Rule 16 of the Federal Rules of Criminal Procedure. The government does not oppose defendant's motion for disclosure and discovery as provided by Rule 16(a)(1). In fact, on January 17, 2017, the government disclosed all materials relevant to Rule 16(a)(1) in its possession, custody, or control (much of it in electronic format), and has supplemented those disclosures with any additional materials subsequently acquired. The government, however, objects to any discovery order that exceeds the requirements of

Rule 16.  The government is aware of its continuing duty to disclose and will comply with that duty.

In light of defendants' requests for discovery under Rule 16, and the government's production of evidence pursuant to Rule 16(a), the government reiterates its discovery motion, previously filed in this case, which requests an order requiring defendants to permit inspection and copying of certain items pursuant to Rule 16(b).

Defendants also move for an order requiring the government to disclose a written summary of the testimony the government intends to use pursuant to Rules 702, 703 and 705 of the Federal Rules of Evidence—the rules pertaining to expert testimony—as authorized by Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure.   The government is aware of its obligation to disclose these materials, and it does not object to these motions.

The government respectfully requests that the Court order all Rule 16(a)(1)(G) disclosures to be made no later than 14 days before trial.[1]   There is no defined timing requirement included in Rule 16(a)(1)(G).  *See* Fed. R. Crim. P. 16 advisory committee's note, 1993 Amendments.   The advisory committee's notes provide that, "although no specific timing requirements are included, it is expected that the parties will make their requests and disclosures in a timely fashion."  *Id.*  In the present case the government's proposal to disclose expert witness materials 14 days in advance of trial is reasonable and

---

[1] As per its previously-filed discovery motion, the government requests reciprocal expert disclosures.

allows ample time for defendants and their counsel to prepare for the testimony. *See United States v. Finn*, 919 F. Supp. 1305, 1316 n.7 (D. Minn. 1995) (ordering Government to make Rule 16(a)(1)(G) disclosures as opinions become available and no later than seven days before trial and rejecting defendant's request that such disclosures be made at least 45 days prior to trial).

## 2.   <u>Motions for Disclosure of Brady Evidence</u> (Doc. No. 47)

In his "Declaration and Outline of Pre-Trial Motions" Hansmeier indicates his intention to file a motion for "disclosure of Brady evidence."  Although this motion does not appear on the docket, the government nevertheless provides the following response. To the extent that defendants request an order compelling the government to disclose any material in its possession that is favorable to them pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, the motions are moot.  The government has already complied, and will continue to comply, with *Brady*, *Giglio*, and related law.[2]  The government objects to the defendants' motions to the extent that they go beyond the requirements of *Brady*, *Giglio*, and their implementing case law.

## 3.   <u>Motions for Disclosure of Rule 404(b) Evidence</u> (Doc. No. 53)

Hansmeier moves for an order requiring the United States to provide notice of its intent to introduce any "bad act" or "similar course of conduct" evidence at trial pursuant to Rule 404(b) of the Federal Rules of Evidence.  The government does not oppose this

---

[2] Furthermore, as the Eighth Circuit has made clear, the *Brady* doctrine "is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation."  *United States v. Malone*, 49 F.3d 393, 396 n.4 (8th Cir. 1994), *cert. denied*, 516 U.S. 877 (1995); *United States v. Roach*, 28 F.3d 719, 734 (8th Cir. 1994).

motion. However, the government does object to Hansmeier's request that the notice be given "in the very near future." Under the rule, the government is required to "provide reasonable notice in advance of trial or during trial if the court excuses pretrial notice on good cause shown." Fed. R. Evid. 404(b); *see* Fed. R. Evid. 404(b) advisory committee's notes, 1991 Amendments ("Other than requiring pretrial notice, no specific time limits are stated in recognition that what constitutes a reasonable request will depend largely on the circumstances on each case."). The government proposes to make its notification 14 calendar days prior to trial. Under the circumstances of this case, 14 days is a reasonable notice period.

The government also requests that any order be strictly drawn to require no more than what is encompassed by Rule 404(b). Specifically, Rule 404(b) does not encompass acts that are "intrinsic" to the charged offense. Fed. R. Evid. 404 advisory committee's notes, 1991 Amendments. If conduct of a defendant is an "intrinsic" part of any of the charged offense but could otherwise be considered a "bad act," then Rule 404(b) does not contemplate that notice of such evidence be given. The distinction is an important one, as the defense may claim that the government must give notice of every "bad act" it intends to introduce, which is not so. *United States v. Adediran*, 26 F.3d 61, 63 (8th Cir. 1994) (standards applicable to evidence considered under Rule 404(b) do not apply to such "inextricably intertwined" evidence).

4.      **Motion to Dismiss** (Doc. Nos. 48, 49)

Defendant Hansmeier moves the court to dismiss Counts 1-17 of the Indictment. Hansmeier argues the detailed allegations set forth in the Indictment do not state an offense,

and asserts the charges brought by the government impermissibly infringe on his "constitutionally-protected" right to engage in frivolous civil litigation. Unfortunately for Hansmeier, no such right exists. There is no safe harbor for fraud simply because one of the tools of the fraud involved litigation. Moreover, Hansmeier and his co-defendant, John Steele, did not simply file dubious lawsuits. They constructed an elaborate ruse designed to deceive people—state and federal judges as well as numerous victims who paid settlement fees to them—and, for that reason, violated the mail and wire fraud statutes. Hansmeier's attempt to confuse this issue, through a convoluted 64-page memorandum wherein he pretends to champion the rights of unethical litigators and thereby create a strawman to save himself, should be rejected.

Defendant also attempts to isolate each part of the scheme, arguing that each facet standing alone cannot state a fraudulent offense. However, the defendant did not commit each act in isolation. He did not merely breach his ethical obligations to the court. He did not solely mislead the court about the nature of his copyright infringement claims, or conceal his surreptitious ownership of his clients and their pornographic content. The indictment charges a multi-faceted scheme designed to deceive various courts and internet subscribers, and when viewed in its totality clearly describes a scheme to defraud.

### A.  The Mail and Wire Fraud statutes encompass a broad array of schemes in which a defendant uses deception to obtain money or property

Mail fraud and wire fraud were specifically designed, and have consistently been interpreted, to cover a broad swath of dishonest activity affecting victims' property rights. As the Eighth Circuit has made clear, mail and wire fraud are more expansive than common law fraud, and cover any scheme in which a defendant uses deception to deprive a victim of his money or property:

> [t]he crime of mail fraud is broad in scope. The fraudulent aspect of the scheme to "defraud" is measured by a nontechnical standard. Law puts its imprimatur on the accepted moral standards and condemns conduct which fails to match the reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of the members of society. This is indeed broad. For as Judge Holmes once observed, "[t]he law does not define fraud; it needs no definition. It is as old as falsehood and as versable as human ingenuity."

*United States v. Bishop* 825 F.2d 1278, 1280 (8th Cir. 1987) (internal quotations omitted). Mail fraud and wire fraud have been broadly and liberally construed to "further the purpose of the statute; namely, to prohibit the misuse of the mails [and interstate wires] to further fraudulent enterprises.  Accordingly, many courts have construed the term 'scheme or artifice to defraud' to include within its ambit widely diverse schemes." *United States v. States,* 488 F.2d 761, 764-65 (8th Cir. 1973) (citations omitted).

Generally, "the mail and wire fraud statutes broadly apply to any scheme 'where in order to get money or something else of monetizable value from someone you make a statement to him that you know to be false, or a half truth that you know to be misleading, expecting him to act upon it to your benefit and his detriment.'" *United States v. Morris*,

80 F.3d 1151, 1160 (7th Cir. 1996) (quoting *Emery v. American Gen. Fin., Inc.,* 71 F.3d 1343, 1346 (7th Cir. 1995)). The statutes apply not only to false or fraudulent representations, but also to the omission or concealment of material information "if it is intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled." *Id*. at 1161 (quotations omitted). Thus, "[s]chemes using deceptive practices to induce the unwary to give up money or some other tangible property interest are within the scope of [the mail fraud and wire fraud statutes]." *Atlas Pile Driving Co. v. Dicon Financial Co.*, 886 F.2d 986, 991 (8th Cir. 1989).

Although a scheme to defraud invariably involves deception, there is no requirement that the person whose money or property is the object of the scheme was the one who was deceived. *See*, *e.g.*, *United States v. Blumeyer*, 114 F.3d 758, 768 (8th Cir. 1997) (concluding that "a defendant who makes false representations to a regulatory agency in order to forestall regulatory action that threatens to impede the defendant's scheme to obtain money or property from others is guilty [of violating the mail fraud statute]" even though it was the policyholders who incurred the financial losses); *United States v. Greenberg*, 835 F.3d 295, (2d Cir. 2016) ("[W]e agree with the First Circuit that the statutory language in both the mail and wire fraud statutes 'is broad enough to include a wide variety of deceptions intended to deprive another of money or property' and '[w]e see no reason to read into the statutes an invariable requirement that the person deceived be the same person deprived of the money or property by the fraud.'") (quoting *United States v. Christopher*, 142 F.3d 46, 54 (1st Cir. 1998)). Thus, where a defendant deceives

one party in order to obtain money or property from another party, mail and wire fraud are properly alleged.

### B.      The Indictment adequately describes a scheme to defraud

Under Rule 12(b)(3)(B), a defendant may move the court to dismiss the indictment on the grounds that the indictment fails to state an offense.  An indictment adequately states an offense if:

> it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution.  An indictment will ordinarily be held sufficient unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense for which the defendant was convicted.

*United States v. Hernandez*, 299 F.3d 984, 992 (8th Cir. 2002); *see also United States v. Sewell*, 513 F.3d 820, 821 (8th Cir. 2008) ("An indictment is normally sufficient if its language tracks the statutory language.")

Rule 12 does not provide an avenue for a defendant to challenge the indictment based on "policy" grounds, or his own interpretation of the facts.  "An indictment should be tested solely on the basis of the allegations made on its face, and such allegations are to be taken as true." *United States v. Hughson,* 488 F.Supp.2d 835, 841 (D.Minn. 2007) (quoting *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994)). "When considering a defendant's argument for dismissal pursuant to Rule 12, the court must accept all of the government's allegations in the charging document as true." *United States v. Hecker,* No. 10–cr–32 (JNE/SRN), 2010 WL 3463393, at *7 (D.Minn. July 6, 2010). "[T]he Indictment will generally be deemed sufficient "unless no reasonable construction can be said to

charge the offense.'" *Hughson,* 488 F.Supp.2d at 840–41 (quoting *United States v. Morris,*

18 F.3d 562, 568 (8th Cir. 1994)).

The Indictment in this case goes well beyond what is required by the Eighth Circuit,

providing the defendant with a detailed description of the acts and omissions that constitute

the charged scheme to defraud.  Paul Hansmeier and John Steele used various means—

described in the Indictment and summarized below—to deceive State and Federal judges,

as well as numerous individuals they threatened to sue, into believing that they were merely

attorneys representing the producers of adult film content who had detected people illegally

distributing their clients' copyright-protected works.  In fact, defendants:

(a)   owned and controlled their clients, which defendants domiciled in Nevis to obscure their control;

(b)   used the names of their associates—Mark Lutz, Alan Cooper, and Anthony Saltmarsh—as representatives of their "clients" to further conceal their interest in the underlying pornographic movies;

(c)   filmed and obtained copyrights to pornographic "works" for the sole purpose of generating settlement fees, but assigned the copyrights to their Nevis-based "clients" to conceal their ownership;

(d)   uploaded their own copyrighted movies to BitTorrent websites, using a virtual private network and anonymous username to conceal their involvement, knowing that BitTorrent websites exist to facilitate copyright theft;

(e)   filed lawsuits disingenuously alleging that individuals associated with certain IP addresses downloaded their works without authorization or consent, concealing from the court their own involvement in the purported copyright infringement as well as the fact that they had no intent to pursue the litigation beyond obtaining early discovery;

(f)   sent communications and placed telephone calls to victims wherein they deceived the victims into believing that their copyright infringement claims were untainted, and leveraged the copyright statutory damages in order to

extract quick settlements from the victims and avoid litigation that might unearth their scheme;

(g)    invented from whole cloth knowingly false allegations of a hacking cabal focused on their "clients" when courts refused to grant them mass discovery;

(h)    recruited individuals to falsely pose as civil defendants in these "hacking" lawsuits so that they could conduct broad early discovery without opposition; and

(i)    systematically perjured themselves and caused their associates to perjure themselves in order to carry out and cover up their scheme.

Relying on the defendants' mountain of falsities, courts authorized them to conduct early discovery to learn the identities of the individuals who controlled the IP addresses identified by defendants.   Those individuals, unaware that defendants had themselves distributed the copyrighted movies and fearful of the significant penalties and embarrassment associated with a public lawsuit, paid millions of dollars in settlement fees to the defendants.   Thus, the defendants deceived judges and internet subscribers and thereby obtained money in the form of settlement payments.

The government's allegations clearly set forth a scheme to defraud.

### C.    The use of civil litigation does not distinguish defendant's fraud

Hansmeier attempts to immunize himself by mischaracterizing the holding of two cases—*I.S. Joseph Co. v. J. Lauritzen A/S*, 751 F.2d 265 (8th Cir. 1984) and *United States v. Pendergraft*, 297 F.3d 1198 (11th Cir. 2002)—to create a false barrier to criminal liability under the pretense of engaging in "protected" civil litigation activities.   However, neither case supports Hansmeier's attempt to portray his fraudulent acts as "constitutionally-protected."   At best, these cases stand for the proposition that knowingly filing a non-meritorious lawsuit—*standing alone*—should not constitute a scheme to

defraud. However, as explained above, the defendants did much more than file lawsuits they knew to be false.

In *I.S. Joseph Co.*, the Eighth Circuit addressed the question of whether a groundless threat to sue could form the basis of a civil RICO claim premised on extortion. 751 F.2d at 267. The court, after defining extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear…," held that threatening to file a lawsuit was not tantamount to the infliction of force, violence, or fear, and thus the plaintiff could not establish the crime of extortion. *Id*. The court in *I.S. Joseph* said nothing about mail or wire fraud, and thus the case has little to offer in the instant matter. Hansmeier overreaches in his attempt to transform this case into a broader proscription on civil litigation activities forming any part of a criminal scheme to defraud.

In *Pendergraft*, the Eleventh Circuit was faced with a criminal defendant who had been charged with both Hobbs Act extortion and mail fraud after threatening to file lawsuits against a governmental entity based on false affidavits (which, importantly, the victims knew were false). 297 F.3d at 1205. With regard to extortion, the Court held that a threat to sue, by itself, was not wrongful within the meaning of the Hobbs Act, but emphasized that its holding in this regard was "narrow." *Id*. at 1206-08. Turning to the mail fraud counts, the Court held that because representatives of the victim knew that the affidavits were false, they could not have been deceived by the false affidavits and, aware that the victim was not deceived, the defendant could not have had the requisite "intent to deceive" to constitute mail fraud *Id*. at 1209. The court in *Pendergraft* did not hold, as Hansmeier claims, that mail fraud cannot be premised on the falsity of statements made in civil

litigation because "the very purpose of the civil courts is for parties to attack and expose such falsity." (Doc. 49 at 34.) [3]  Thus, neither *I.S. Joseph* nor *Pendergraft* are a bar to the current prosecution.

Two other cases—only one cited by Hansmeier—are also instructive on the interplay between civil litigation and criminal prosecutions.  Another Eleventh Circuit case that followed *Pendergraft* involved a mail fraud scheme in which the defendants, among other things, sent several fraudulent legal documents to the victim bank.  *United States v. Lee*, 427 F.3d 881, 885-86 (11th Cir. 2005). The defendants in *Lee* cited *Pendergraft* for the proposition that "strong public policy" considerations prevent the government from basing a scheme to defraud on civil litigation activities.  *Id*. at 890.  The Eleventh Circuit noted that its comments in *Pendergraft* regarding the public policy of not basing a mail fraud scheme solely on a malicious prosecution claim were merely "dicta" and held that "[u]ltimately, it was due to the absence of an intent to deceive, and not upon any policy concerns relating to using the mails in connection with litigation, that we held that the mail fraud indictment failed to charge an offense as a matter of law."  *Id*.  The Court further distinguished *Pendergraft* on the basis that the defendants in *Lee* did not actually file the fraudulent legal documents and instead sent them directly to the victim.  However, the Court clearly recognized that *Pendergraft* was not intended to immunize from criminal prosecution defendants who used civil process in the course of committing a fraud: "While

---

[3] Notably, several of the federal courts reviewing the defendants' conduct did not believe that civil sanctions were an appropriate and sufficient remedy for the defendants' conduct.  They viewed defendants' actions—those they knew of—as constituting a potential fraud, and referred the defendants for criminal prosecution.

we must be mindful of the concerns for placing obstacles in the path of full access to our courts, we cannot countenance mailing false claims clothed in legalese to lenders, with the intent of perpetrating or perpetuating a fraud, even where litigation is ongoing." *Id.* at 891.

In *United States v. Eisen*, the government charged a mail fraud scheme alleging that multiple lawyers and private investigators filed numerous false lawsuits using perjured testimony and fake evidence. 974 F.2d 246, 251 (2d Cir. 1992).[4]   The Second Circuit upheld the government's reliance, almost exclusively, on civil litigation activities as the premise for a scheme to defraud. *Id.* at 253-54.   Hansmeier unpersuasively attempts to distinguish *Eisen*, arguing that "courts have construed *Eisen* quite narrowly" and "the *Eisen*-type theory can only possibly be viable when there is an allegation of racketeering-type activity external to the civil litigation, *e.g.*, concocting fake evidence to later be used in civil litigation." (Doc. 49 at 35.)   Neither the Second Circuit nor any other court has distinguished *Eisen* in this fashion.   However, even if the Court were to adopt Hansmeier's self-serving "external fraud" standard, the Indictment in this case would clearly pass that test.   As described above, the defendants committed multiple fraudulent acts that were "external" to their civil litigation activities, including among other things concocting "fake evidence"—*e.g.* copyrights in the name of sham entities; documents concealing their ownership of clients; affidavits deceptively detailing their "detection" of infringing activities—and, as in *Eisen*, procured false testimony to further the scheme.

---

[4] As in the instant case, the *Eisen* court noted that "misrepresentations in pleadings and pretrial submissions were made in the hope of fraudulently inducing a settlement before trial." *Id.* at 253.

At most, the cases cited by the defendant, and herein, caution that mail fraud charges should be based on more than a malicious prosecution claim.   This is particularly concerning in the civil RICO context where civil litigants attempt to inflate normal litigation disputes into federal criminal allegations.   However, no court has excluded false and deceptive civil litigation activities from forming a part—even a significant part—of a scheme to defraud in a mail fraud charge.[5]   The public policy of encouraging citizens to utilize the civil court system to resolve disputes is not implicated by holding Paul Hansmeier responsible for, among other things, systematically deceiving judges in order to obtain the identities of his victims.

### D.      Defendant's purposeful concealment of their "seeding" activities is part of the scheme to defraud

Hansmeier next argues that his "seeding" activities—surreptitiously placing his copyrighted movies on BitTorrent websites so that people would download them—were perfectly legitimate and cannot form any part of a scheme to defraud.   However, before discussing Hansmeier's mischaracterization of copyright law, it bears noting that this is entirely beside the point.   Hansmeier and Steele never intended to litigate their copyright infringement claims.   They had no interest in a court determining the validity of their copyright; in fact, they never once proceeded past the initial pleading stages of a copyright infringement case (except when forced to defend sanctions orders), invariably dismissing cases as soon as a defendant fought back.   What they deceptively extracted from courts

---

[5] Bankrutpcy fraud, for example, is often premised almost exclusively on civil litigation filings.

was the ability to subpoena internet service providers for the identities of subscribers. Early discovery was the lifeblood of their scheme. Once obtained, the defendants used extortionate tactics to garner what settlements they could obtain, and then dismissed the case. And, as will be established at trial, while the defendants knew that their copyright infringement claims were susceptible to multiple legal and equitable defenses, they also knew that courts would refuse to grant them early discovery if the courts knew the totality of their deceptive scheme.

Early discovery is entirely within the discretion of the court. Rule 26(d)(1) of the Federal Rules of Civil Procedure provides that "[a] party may not seek discovery from any source before the parties have conferred as required by Rule 26(f), except … when authorized … by court order." Although courts typically will grant early discovery where necessary to identify a defendant, courts have wide latitude to deny early discovery where identification of the defendant seems uncertain, the plaintiff's claims are underwhelming, or equity dictates otherwise. *See, e.g.*, *Hard Drive Productions, Inc. v. Does 1-90*, No. 11-cv-3825 (HRL), 2012 WL 1094653 at *7 (N.D. Cal. 2012) (in relation to a case brought by Hansmeier: "the court will not assist a plaintiff who seems to have no desire to actually litigate but instead seems to be using the courts to pursue an extrajudicial business plan against possible infringers (and innocent others caught up in the ISP net). Plaintiff seeks to enlist the aid of the court to obtain information through the litigation discovery process so that it can pursue a non-judicial remedy that focuses on extracting settlement payments from persons who may or may not be infringers. This the court is not willing to do."); *AF Holdings LLC v. Doe*, No. 12-cv-1063 (JAM/KJN), 2012 WL 1898843 at *2 (E.D. Cal.

2012) (expedited discovery permitted upon a showing of "good cause," *i.e.* "where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party").

Defendants disguised the true nature of their enterprise from courts when applying for early discovery. They hid the fact that they actually owned and controlled the clients; they obscured their role in filming pornography and obtaining copyrights for the sole purpose of abusing the court system to obtain settlement fees; they concealed the fact that they had uploaded those same movies onto file-sharing websites to lure people to download the movies; and they falsely indicated their desire to litigate their copyright claims in court when, in fact, all they wanted was the court's subpoena power. There can be no question that these lies and omissions were material, as was evidenced by the reaction of several courts in this case. As soon as those courts discovered even a small part of the defendants' scheme, they immediately shut down defendants' attempts to obtain early discovery, ordered defendants to repay settlement fees, imposed sanctions on everyone involved and, in some instances, referred the matter for criminal investigation. *See*, *e.g.*, *Ingenuity 13 LLC v. Doe*, No. 12-cv-8333 (ODW), 2013 WL 1898633, Doc. No. 130 (C.D. Cal. May 6, 2013); *AF Holdings, LLC v. Joe Navasca*, No. 12-cv-2396 (EMC), 2013 WL 5701104, Doc. No. 100 (N.D. Cal. July 22, 2013); *see also Ingenuity13 LLC v. Doe*, 651 Fed. Appx. 716, 718 (9th Cir. 2016) ("By misusing the subpoena power of the court, the Prenda Principals made millions of dollars from suing hundreds to thousands of 'John Does' across the country."); *Lightspeed Media Corp. v. Smith*, 761 F.3d 699, 709 (7th Cir. 2014) (recognizing that Hansmeier was engaged in "abusive litigation" and therefore district

court was correct to quash subpoenas and award sanctions).   Thus, defendant's attempt to deny an intent to defraud by falsely justifying their copyright claims dodges the true thrust of the charged scheme to defraud.

Turning to copyright law, Hansmeier incorrectly asserts that "the government … concedes that the computer users at issue here did, in fact, violate the Copyright Act via digital file-sharing activities (or, at least, that a better than good faith belief existed)." (Doc. 49 at 38.)  To the contrary, it is the government's position that *none* of "the computer users at issue here" violated any part of the Copyright Act because Hansmeier, himself, expressly consented to the very conduct for which he later extorted the "computer users." (Indictment ¶¶ 20-23.)   Hansmeier directed his brother, Peter Hansmeier, to post his pornographic movies to file-sharing websites using the pseudonym SharkMP4 (defendant's online moniker), thereby making the works at issue available for users to download and authorizing their download.  (*Id.*; *see also* ¶ 7.)  Once "SharkMP4" expressly consented to the download of these works, SharkMP4 could not legally and equitably sue or threaten to sue defendants for the conduct he himself had authorized.

Although Hansmeier now claims to have believed his copyright infringement claims were legitimate (Doc. 49 at 38-41), the jury will find that during the relevant time period Hansmeier knew that: (1) his conduct was not lawful; (2) as noted above, if courts had known what he was doing, they would not have permitted him to obtain early discovery; and (3) if users had known what he was doing, many would not have settled with him. Hansmeier's intent to defraud is confirmed by the extensive acts he undertook to conceal his conduct, including: (1) falsely denying under oath that he was involved in uploading

the videos he later sued about (Indictment ¶ 33(k) (Hansmeier signed a sworn declaration "categorically deny[ing] ever uploading and/or downloading any BitTorrent files of any past client of mine, including AF Holdings"); (2) uploading the works using a Virtual Private Network (or from public Wi-Fi) to conceal his identity; (3) using an anonymous online moniker (SharkMP4) to further conceal his identity; (4) creating sham entities to make it appear that he was not the owner of these works, nor the principal beneficiary of the scheme (*id.* ¶¶ 1, 13-14, 17, 26, 29); and (5) falsely denying his control of those sham entities under oath (*id.* ¶ 33(k)).   The defendant's own conduct flatly contradicts his contention that he believed the copyright infringement claims were legitimate.

In any event, simple common sense and the great weight of the implied license cases suggest that Hansmeier unquestionably authorized the conduct upon which he sued.  The concept of an "implied nonexclusive license" in copyright "has been recognized not only by Nimmer, a preeminent treatise on copyright law, but also by the courts . . . which universally have recognized that a nonexclusive license may be implied from conduct."  *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996); *see also Pinkham v. Sara Lee Corp.,* 983 F.2d 824, 831 (8th Cir.1992) ("[U]nlike an exclusive license, an authorization can be given orally or implied from conduct."); *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 551 (1985) ("In a given case, factors such as implied consent through *de facto* publication on performance or dissemination of a work may tip the balance of equities in favor of prepublication use.")

Numerous courts have found implied licenses under analogous circumstances.  *See, e.g., Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1115-16 (D. Nev. 2006) (finding that

website owner gave "implied license" to Google to reproduce portions of his website on the search engine by consciously choosing not to include "no-archive" meta-tags on pages of his website); *Geophysical Servs., Inc. v. TGS-Nopec Geophysical Servs.*, No. CIV.A. 14-1368, 2015 WL 1461235, at *10 (S.D. Tex. Mar. 30, 2015) (holding that "[a] party who knows of and encourages copying grants an implied license to the copier to do so."); *Righthaven LLC v. Klerks*, No. 2:10-CV-00741-GMNLRL, 2010 WL 3724897, at *4 (D. Nev. Sept. 17, 2010) (declining to strike "implied license" defense where the copyright holder allegedly "offered the article to the world for free, encouraged people to save and share the article with others without restrictions, and permitted users to 'right-click' and copy the article from its website.")

Hansmeier cites a few outlier cases involving Malibu Media in which the court struck some, but not all, affirmative defenses or counterclaims based on allegations of seeding. *See Malibu Media, LLC v. Doe*, 2014 WL 2581168 (N.D. Ill. 2014); *Malibu Media, LLC v. Thal*, 2016 WL 7240764 (N.D. Ill. 2016).[6] However, even in the primary *Malibu Media* case relied upon by Hansmeier, although the court struck the affirmative defense of estoppel, it allowed the defendants to proceed with an affirmative defenses of unclean hands and implied license. More importantly, Hansmeier fails to acknowledge the vast majority of courts that denied Malibu Media's motion to strike affirmative defenses, and acknowledged the viability of defenses such as implied license, waiver, unclean hands,

---

[6] Malibu Media was another entity that sued individuals alleged to have downloaded its copyrighted works. Some defendants filed answers that alleged affirmative defenses related to Malibu Media's alleged seeding. Unlike the present case, however, no evidence of seeding ever materialized with respect to Malibu Media.

and abandonment where a plaintiff is alleged to have seeded their copyrighted works. *See,*
*e.g., Malibu Media, LLC v. Doe*, No. 2:13-CV-135-RLM-JEM, 2014 WL 1031336, at *5
(N.D. Ind. Mar. 17, 2014) (finding that "[b]ecause Defendant's assertion that Plaintiff
authorized use of its works via BitTorrent could arguably be among the conduct from
which a license may be implied, this defense creates a substantial enough question of law
to withstand a motion to strike."); *Malibu Media, LLC v. Doe*, No. 13 C 3648, 2014 WL
2581168, at *5 (N.D. Ill. June 9, 2014) (finding "all that is needed to show an implied
license is that the 'totality of the parties' conduct indicate[d] an intent to grant such
permission" and that the "relevant intent is not the parties' subjective intent but their
outward manifestation of it.") (citations omitted); *Malibu Media, LLC v. Zumbo*, No. 2:13-
CV-729-JES-DNF, 2014 WL 2742830, at *2 (M.D. Fla. June 17, 2014) (finding the
defense of "waiver" was sufficiently pled where defendant alleged that plaintiff made the
works "freely available on the Bittorent network and a variety of other sources . . . and
without paid subscription," and thereby had "authorized distribution on the
internet."); *Malibu Media, LLC v. Does 1*, No. CIV.A. 12-2078, 2013 WL 1702549, at *5
(E.D. Pa. Mar. 6, 2013) (denying motion to strike "implied license" defense, noting that
"[t]here is no conclusive test for finding an 'implied license' in the Third Circuit."); *Malibu
Media, LLC v. Guastaferro*, No. 1:14-CV-1544, 2015 WL 4603065, at *6 (E.D. Va. July
28, 2015) (denying motion to strike fair use, copyright misuse, unclean hands,
abandonment, and other defenses).

Given that numerous courts had suggested that an implied license (or other
affirmative defenses) can defeat a claim of copyright infringement in analogous

circumstances, the defendant's seeding activities were clearly material.  If the courts wherein Hansmeier filed these lawsuits became aware that he was distributing copyrighted movies to individuals and then suing them for downloading those movies from him, Hansmeier knew that many, if not all, would find that he had impliedly authorized the distribution, find that he had waived or abandoned his copyright claim or, at a minimum, would refuse to grant him early discovery.

Furthermore, the government's mail fraud and wire fraud claims do not depend solely on seeding, which was only one of many aspects of the defendant's criminal scheme. Most glaringly, Hansmeier's motion to dismiss makes no mention of the government's allegation that he filed lawsuits containing allegations of "hacking" that were entirely made up.  (Indictment ¶¶ 1, 17, 26(c), 26(d), 29-31, 33(b), 33(c).)  Hansmeier also fails to acknowledge the portion of the Indictment detailing how he recruited patsies to pose as defendants in these hacking lawsuits to allow him to obtain early discovery without opposition.  (Indictment ¶¶ 1, 17, 31, 33(c).)  Hansmeier's surreptitious seeding of his own copyrighted movies onto file-sharing websites—while clearly a material omission—was only one part of a larger scheme orchestrated by the defendant.

**E.    Violations of attorney ethical rules can form part of a scheme to defraud, and are relevant to establishing materiality, intent to defraud, and a duty to disclose.**

Hansmeier asks the court to view his violations of attorney ethical rules in isolation, and argues that these transgressions do not amount to a scheme to defraud.  Doc. 49 at 42-48.  However, the government does not contend that Hansmeier violated ethical standards, *ergo* he committed fraud.  Rather, those violations are a significant part of the charged

scheme to defraud because they establish that: (1) Hansmeier had a duty to disclose material information to the court, particularly when applying for early discovery; (2) Hansmeier's secret ownership of his client and stake in the outcome of the litigation was material to the court; and (3) Hansmeier possessed an intent to defraud when carrying out the scheme set forth in the Indictment.

As set forth in the Indictment, as a Minnesota lawyer, Hansmeier owed a duty of candor towards the various courts in which he practiced that forbade him from making false statements, offering false evidence, and in *ex parte* proceedings failing to inform the court of all material facts. (Indictment ¶ 4; MN RPC 3.3.) Hansmeier argues that a violation of this duty would not eviscerate an otherwise valid copyright claim and might have resulted in minimal punishment from the court. This is entirely beside the point. The existence of this duty is relevant because Hansmeier's mere omission (rather than misrepresentation or concealment) of material facts, absent a duty to disclose, may not form the basis of a scheme to defraud under Eighth Circuit law. *United States v. Steffen*, 687 F.3d 1104, 1116 (8th Cir. 2012). The government must demonstrate his duty to disclose, which stems from his ethical obligations. Hansmeier had an independent legal duty to disclose to the court that he in fact owned and controlled his client as well as the subject copyrighted works, had uploaded those copyrighted works onto BitTorrent websites, and was now seeking to obtain early discovery solely in order to threaten to sue people associated with the IP addresses to which he had distributed his own pornographic movies. The court would have found these facts material in deciding whether to grant early discovery and allow Hansmeier's claims to proceed.

Hansmeier also cites to Model Rule of Professional Conduct 1.8(i), which prohibits an attorney from acquiring a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client. Hansmeier again argues that his violation of this rule would not destroy his copyright claim, and he may have escaped serious punishment. Hansmeier again misses the point. As noted above, a court reviewing Hansmeier's request for early discovery would want to know that Hansmeier owned and controlled his own "client," particularly given the potential for abusive litigation practices prevalent in copyright infringement cases. This is a conclusion on which we do not need to speculate. Indeed, it was largely on this basis that courts began refusing to grant Hansmeier's early discovery requests when his possible control over client entities was first raised.

Finally, all of Hansmeier's ethical transgressions are relevant to demonstrating that he possessed an intent to defraud when carrying out the scheme set forth in the indictment. *United States v. Wirtz*, No. 04-cr-18 (PAM/RLE), 2004 WL 2271745 at * (D. Minn. 2004) ("evidence that the defendant knew his conduct was unethical or wrong is relevant to show a defendant's intent to defraud"); *United States v. Fumo*, 655 F.3d 288, 302-03 (3d Cir. 2011) (evidence of breach of ethical rules found relevant to proving intent to defraud).

The Indictment in this case contains a detailed description of a scheme to defraud. As set forth above, the mail and wire fraud statutes broadly encompass any scheme, such as the one described in the Indictment, where a defendant uses deceptive means to obtain money or property from a victim. Hansmeier's attempts to carve out an exception to the fraud statutes protecting civil litigation activities, as well as his attempts to isolate his

unethical conduct, are unavailing.  To the extent that defendant argues he believed his conduct was lawful, and therefore he lacked the requisite intent to defraud, this is a factual issue that should be resolved at trial, not through a motion to dismiss.  The court should deny defendant's motion to dismiss.

5.      **Motion for Bill of Particulars** (Docket No. 50)

An indictment is "legally sufficient on its face if it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to subsequent prosecution." *United States v. Wessels*, 12 F. 3d 746, 750 (8th Cir. 1993) (*citing United States v. Young*, 618 F.2d 1281, 1286 (8th Cir. 1980)).  An indictment is sufficient "unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense" the defendant is charged with.  *United States v. Hayes*, 574 F.3d 460, 472 (8th Cir. 2009). As a general matter, an indictment will be held sufficient if it tracks the language of the charging statute. *United States v. Sewell*, 513 F.3d 820, 821 (8th Cir. 2008).

The district court has discretion to grant or deny a motion for a bill of particulars. *United States v. Bowie*, 618 F.3d 802, 817 (8th Cir. 2010).  Courts will only order the government to produce a bill of particulars when the indictment is so vague that the defendant cannot tell what he is charged with.  On the other hand, a bill of particulars is "not to be used to provide detailed disclosure of the government's evidence at trial." *Wessels*, 12 F.3d at 750.  When a defendant seeks a bill of particulars for an improper purpose, the district court should exercise that discretion by denying the motion.

One such improper purpose is seeking a bill of particulars to obtain discovery. "A bill of particulars is not a discovery device to be used to require the government to provide a detailed disclosure of the evidence that it will present at trial." *United States v. Huggans*, 650 F.3d 1210, 1220 (8th Cir. 2011) (*quoting United States v. Livingstone*, 576 F. 3d 881, 883 (8th Cir. 2009)). Yet discovery is exactly what Hansmeier seeks through this motion; details about the identity of the victims, the amount of loss, a catalogue of each and every fraudulent act (as well as an explanation of which ones might not be fraudulent standing alone), and other specific items. A bill of particulars is not intended to be a substitute for discovery, nor is it designed to provide information that the defendant might regard as generally helpful, but which is not essential to his or her defense. *Wessels*, 12 F.3d at 750.

Hansmeier also seeks to have the government define and explain the boundary between fraud and legality. The government is not required to prepare a treatise for the defendant explaining why precisely his conduct constitutes fraud. The defendants used various methods—all of which are described in the Indictment—to deceive state and federal courts into allowing them to pursue early discovery, and then tricked numerous individuals into parting with their money. The indictment in this case is more than sufficiently detailed, and has been supplemented by voluminous governmental disclosures that have gone well beyond what the government is legally obligated to provide. The indictment not only contains language that tracks the statutory elements of all of the offenses charged, but also provides extensive details regarding criminal conduct alleged to form the basis of those charges. The defendant's motion for a bill of particulars should be denied.

Dated:      June 2, 2017                    Respectfully submitted,

                                            GREGORY G. BOOKER
                                            Acting United States Attorney

                                            *s/ David J. MacLaughlin*

                                            FOR:  BENJAMIN F. LANGNER
                                            DAVID J. MACLAUGHLIN
                                            Assistant U.S. Attorneys

                                            BRIAN L. LEVINE
                                            Senior Counsel
                                            United States Department of Justice