UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | | |
|---|---|---|
| United States of America, | ) | File No. 16CR334 (JNE/KMM) |
| Plaintiff, | ) | |
| vs. | ) | Minneapolis, Minnesota |
| | ) | August 17, 2018 |
| Paul R. Hansmeier, | ) | 9:35 A.M. |
| Defendant. | ) | |

---

BEFORE THE HONORABLE JUDGE JOAN N. ERICKSEN
UNITED STATES DISTRICT COURT
**(CHANGE OF PLEA HEARING)**

APPEARANCES

For the Plaintiff: United States Attorney's Office
DAVID J. MacLAUGHLIN, AUSA
300 South Fourth Street
Suite 600
Minneapolis, MN 55415

For the Defendant: Office of the Federal Defender
MANVIR ATWAL, ESQ.
300 South Fourth Street
Suite 120
Minneapolis, MN 55415

Court Reporter: KRISTINE MOUSSEAU, CRR-RPR
1005 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

Proceedings recorded by mechanical stenography; transcript produced by computer.

**9:35 A.M.**

**(In open court.)**

THE COURT: Good morning, everybody. Please be seated.

Counsel, identify yourselves for the record, please.

MR. MacLAUGHLIN: Your Honor, David MacLaughlin appearing for the United States. To my left is Special Agent Jared Kary and Special Agent Vadym Vinetsky, both of the FBI. Good morning.

THE COURT: Good morning.

Ms. Atwal.

MS. ATWAL: Good morning, Your Honor. Manny Atwal on behalf of Mr. Hansmeier, who is sitting next to me.

THE COURT: Good morning. Ms. Atwal, I understand that Mr. Hansmeier is intending to enter a guilty plea this morning; is that true?

MS. ATWAL: Yes, Your Honor.

THE COURT: All right. Mr. Hansmeier, come on up to the podium with your lawyer if you would. I've received in advance a copy of a plea agreement, and, Mr. Hansmeier, let me ask if you've got the original in front of you there?

THE DEFENDANT: I believe I do, Your Honor, yes.

THE COURT: Well, let's make sure you do.

THE DEFENDANT: Now I do.

THE COURT: Okay. Okay. There was a minor change on page I think 8, if I recall correctly, from the original one and now the current one, so that's why I want to make certain that you have the current one. I would like to review in brief the plea agreement to make sure there aren't any misunderstandings about it.

Assuming that you want to continue on with a change of plea, I'll put you under oath. That means that if you make a false statement, you could be prosecuted for perjury or false statement. I will get some background information from you, age, language, education, time to talk with your lawyer, mental health, physical health issues.

That's all to make sure that you are able to make a knowing and intelligent and voluntary plea. It's important because if you plead guilty, you don't have a chance to withdraw the plea. I understand that the plea agreement has a provision for you reserving a legal issue, and so setting that aside, you would not be able to change your mind about your plea of guilty.

So if at any point during a plea, this plea hearing, you change your mind and don't want to go forward

with it, now is the time to change your mind because there is no tomorrow once we get to the end and if you do enter your plea.

You understand that obviously, right?

THE DEFENDANT: I do.

THE COURT: So the plea agreement calls for you to plead guilty -- let me get the first page here.

Two counts, I believe. Ms. Atwal, is that right? 1 and 17?

MS. ATWAL: Yes, Your Honor.

THE COURT: -- Count 1 of the indictment, which is a conspiracy to commit mail and wire fraud and then Count 17, which is a conspiracy to commit money laundering, and then the government agrees to dismiss the remaining counts at the time of sentencing.

Paragraph 2 sets out the condition for withdrawal that I referred to earlier, and that allows you to preserve your right to appeal this Court's denial of your motion to dismiss, and those documents appear at ECF docket number 66 and 76. So if you were to prevail on your appeal of that legal issue, then you would be able to withdraw your guilty plea if you so chose.

If that happened, the counts that the government dismissed pursuant to this plea agreement would be reinstated, and you agree pursuant to this plea agreement

to waive any statute of limitations argument that you might have in regard to those counts.

Is that the agreement that you've all worked out because you apparently really want to preserve your right to appeal that docket number 76?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. There is a factual basis, and we'll go through that in a bit. That takes up quite a few pages of the plea agreement, if I recall correctly. Let me just talk to you about the statutory penalties. Count 1 is the conspiracy for mail and wire fraud. That's 18 U. S. Code Section 1349, and that carries a maximum term of imprisonment of 20 years.

Do you understand that? You want to look at page 7 of the plea agreement.

THE DEFENDANT: Yes, Your Honor.

THE COURT: The fine is up to $250,000 or twice the gross gain or loss, whichever is greater. There is a term of supervised release of up to five years. Supervised release is a period of time during which a person is under court ordered supervision. If they violate the terms of supervised release, they can be sent back to prison for an additional period of time up to the original term of supervised release.

So that means if a person gets a five-year

supervised release term, for example, and they're out for four years doing fine, in year four they violate, they could be sent back to prison for five years, even if they had gotten the statutory maximum before because that's just the way that supervised release works in the federal system. That's spelled out in paragraph 5, but I just want to make sure that you do understand that, and it appears that you do.

Each of the counts that you will be pleading to is a felony, and that means that there will be a special assessment of $100. That money goes to the Crime Victims Fund. 18 U. S. Code 1349, the Count 1, also carries the possibility that you could be assessed the cost of prosecution.

And then the other count, Count 17, charges a violation of Title 18 United States Code Section 1956(h), and that also carries a maximum term of imprisonment of 20 years, a fine of up to $500,000 or twice the gross gain or loss, whichever is greater, again a term of supervised release of up to five years, the $100 special assessment, as I said before, and also this count carries the cost of prosecution.

Separate from the statutory penalties, there are sentencing guidelines. The sentencing guidelines are one factor for the Court to take into consideration in

determining what your sentence ought to be, and it is the Court's responsibility to determine what your guideline range is.

Once I determine what your guideline range is, with the help of the probation report and input from you and from the government, I will make a decision. So then once that's done, then the law permits a sentence within the guideline range or above it or below it, and the Court is not bound by the guideline calculations that are agreed to or predicted by the parties in a plea agreement, but let's just take a look at it.

The base offense level is agreed to be a 7, but then there are some adjustments that would be made to that. One has to do with the amount of loss, but based on the facts known by the government at this point, it appears that the loss resulting was somewhere between $1,500,000 and $3,500,000.

So that means that if you look at the grid in the book, that's a 16-level increase, so that's spelled out in paragraph 6(b)(1). The guidelines provide for the adjustment due to the level of victims, and because this offense involved ten or more, that would be an increase of two. There is also an agreement that sophisticated means were used, which results in an increase of two levels.

Now, there are some aspects of disagreement, and

one is the Chapter 3 adjustment for aggravating role. The government contends, according to the plea agreement, that you were an organizer, leader, manager or supervisor of criminal activity that involved five or more participants or was otherwise extensive which would result in an offense level increase of four.

And you are -- haven't committed one way or the other, but you do reserve under this plea agreement the right to object to the application of that enhancement. Is that, have I correctly understood the plea agreement in that regard?

THE DEFENDANT: Yes, Your Honor.

THE COURT: There is agreement that the abuse of position of public or private trust in a manner that significantly facilitated the commission and concealment of the offense adjustment for two levels is appropriate. There is disagreement about the obstruction of justice enhancement. That's another two-level enhancement.

The government thinks that the two levels for obstruction, which is defined as willfully obstructing or impeding the administration of justice with respect to the investigation of the offense of conviction, relevant conduct, you reserve the right to object to the application of that enhancement.

So with some agreements and some disagreements

and the understanding that the Court is not bound by any of this, the agreement would be that the offense level for Count 17 would be a 29, and none of the Chapter 3 enhancements are applicable to the conduct comprising Count 17. So the -- well, I'll just read this. It's hard to summarize.

You've got the two count, there is this two count, multiple count provision in the guideline book that talks about how to deal with the situation where the guidelines for one count is different from another, another, another. Obviously it's not fair to take -- let's say one count has a guideline offense level of 20 and another one has a level of 20, I mean, you wouldn't just add 20 and 20 and 20.

So the offense level for Count 17 is a 29, predicted to be, and that's less than the offense level for Count 1, which would be a 33, and so in the book, the directions are to apply the higher of the two offense levels, so that would be the 33, assuming the application of all the enhancements that we just talked about.

Assuming that you accept responsibility as set forth in subparagraph 5 there on page 9, the government is agreeing to recommend that you get the three levels for acceptance of responsibility, and so we would arrive at the total offense level, let's say a 30. Then we've dealt with

the vertical axis. Mr. MacLaughlin is here to tell me I'm reading this wrong or doing something wrong here. It's the only reason he ever stands up.

MR. MacLAUGHLIN: So paragraph 5 actually calls for only a two-level reduction.

THE COURT: Well, that's what I saw, but then I thought I might be missing something.

MR. MacLAUGHLIN: And we're not going to make a motion for the third point.

THE COURT: It does say that. I just thought I must be -- it's old habits die hard. I am sorry. Why don't you keep standing there, because I won't guarantee I won't missummarize something else here. Ms. Atwal is listening, too. Mr. Hansmeier, I know you're listening, probably more telling than anyone else.

All right. Forget what I said about three. I only meant two. Okay. So anyway, we got the vertical axis, which is the total offense level. Then we go to the horizontal axis on the book, and that is your Criminal History Category.

I will have more information about your Criminal History Category at the time I get the presentence investigation report, but assuming you're a I and assuming that the adjusted offense level is a 33 -- wouldn't it be a 31? Anyway, if it's a 33, you know how to read the grid on

the book.

THE DEFENDANT: I do.

THE COURT: With a 33 and Category I, the guideline range is 135 to 160 months imprisonment. See now there in paragraph F it says adjusted offense level of 31. Anyway, fine range 35,000 to $350,000; is that right?

MR. MacLAUGHLIN: So that's a mistake. If you add up all the enhancements --

THE COURT: See, I got you there.

MR. MacLAUGHLIN: Yes, you did. It should be 33. The adjusted offense level is 33 is how the math works out. So F is a mistake.

THE COURT: Okay. What does that do to the fine range? My question about the fine range also has to do with the twice the gross gain or loss.

MR. MacLAUGHLIN: This is just the guidelines range.

THE COURT: Okay.

MR. MacLAUGHLIN: The statutory range is higher. This doesn't bind the Court. This is just the guidelines fine range, and this is the fine range for 33, I think.

MS. ATWAL: Yeah.

THE COURT: I can look that up, too. Mr. Hansmeier probably knows, but we're not going to bother him with this. You know, it changes. So actually what is

here in the guideline range is the 33. The 31 would be 30,000 to 300,000, but the 33 is the 35,000 to 350,000.

MR. MacLAUGHLIN: Right. So when Ms. Atwal and I went over this, we missed the 31, but we knew it was 33, and we selected the correct fine range, I believe.

MS. ATWAL: That's correct, Your Honor.

THE COURT: Makes sense. That makes perfect sense.

MR. MacLAUGHLIN: Should we make this handwritten change in paragraph F here in open court or --

THE COURT: Mr. Hansmeier, what's your pleasure? You want to make a handwritten adjustment to the plea agreement here?

THE DEFENDANT: Yes, Your Honor. I think we already have so --

THE COURT: All right. Okay. And the guidelines range would require a term of supervised release of between two and five years. I should mention, it's not in the plea agreement, but in general supervised release is served concurrently. So with multiple counts, you don't do two years of supervised release plus another plus another plus another, and then while you're out, there is some distinction between, in the years of what you're serving on. That tends to be concurrent, and there is a strong presumption in the law that it will be concurrent.

The prison time does not carry that sort of a presumption, and so that is, by statute, that can be consecutive. So that's the difference between the terms of imprisonment and the terms of supervised release.

Paragraph 7 here talks about the discretion and both sides' understanding of that and the inability to withdraw from the agreement or the plea based on any disagreement with the Court's calculations of the sentencing guidelines.

And then, of course, there is mandatory restitution, and you're agreeing to pay the special assessment. I haven't read every single word of this, but if this is the agreement that you have entered into with the government, Mr. Hansmeier, go ahead and sign and date the plea agreement, and once you and the lawyers have signed it, I will receive it.

THE DEFENDANT: Thank you, Your Honor.

MR. MacLAUGHLIN: Your Honor, may I tender it to the Court?

THE COURT: Thank you very much. You would think that it wouldn't be necessary to check it, but I've learned the hard way that you always have to look.

So that's your signature there on the line that says Paul R. Hansmeier, correct?

THE DEFENDANT: It is.

THE COURT: Mr. Hansmeier, raise your right hand, please.

**(Defendant sworn.)**

THE DEFENDANT: I do.

THE COURT: All right. Let's get this background information, starting with your age. How old are you?

THE DEFENDANT: 37.

THE COURT: And did you graduate from high school?

THE DEFENDANT: I did.

THE COURT: Where was that?

THE DEFENDANT: St. Cloud Technical High School.

THE COURT: And then you went to college, did you?

THE DEFENDANT: I did, at St. John's University.

THE COURT: And did you go to college or did you get any education after college?

THE DEFENDANT: I did. I attended the University of Minnesota Law School.

THE COURT: And you got a law degree?

THE DEFENDANT: I did.

THE COURT: Okay. So you're able to read and write?

THE DEFENDANT: I am.

THE COURT: And speak the English language?

THE DEFENDANT: Yes.

THE COURT: All right. Do you speak any other languages?

THE DEFENDANT: No.

THE COURT: So we don't need an interpreter. That's the reason I have to ask that.

THE DEFENDANT: Correct.

THE COURT: Have you had enough time to talk with your lawyer?

THE DEFENDANT: I have.

THE COURT: And you're satisfied she has done a good job of representing you?

THE DEFENDANT: I am.

THE COURT: Has anybody threatened you or pressured you to plead guilty?

THE DEFENDANT: No.

THE COURT: Has anyone made you any promises other than what is contained in the plea agreement?

THE DEFENDANT: No.

THE COURT: Have you had any alcohol in the last 24 hours?

THE DEFENDANT: No.

THE COURT: Have you had any nonprescribed drugs, street type drugs?

THE DEFENDANT: No.

THE COURT: That would be marijuana, heroin, cocaine. I don't know all of them, but none of those, right?

THE DEFENDANT: None of the above.

THE COURT: Are you addicted to narcotics?

THE DEFENDANT: No.

THE COURT: Are you taking any medications that are prescribed by a doctor?

THE DEFENDANT: I am.

THE COURT: Okay. And can you just give me a general sense of the ailments? If you give me the scientific names of the drugs probably won't mean anything, but what are you being treated for?

THE DEFENDANT: Rosacea.

THE COURT: Okay. And none of the medications for that would affect your clarity of mind in court, would they?

THE DEFENDANT: They would not.

THE COURT: Okay. Anything else?

THE DEFENDANT: Nothing.

THE COURT: Okay. Psychologist, psychiatrist, any mental or emotional diagnoses?

THE DEFENDANT: No.

THE COURT: Okay. All right. Let's talk about the rights that you give up by pleading guilty. You do

have a right to go to trial, and the trial has to take place within a reasonably, you know, within the time period that would give you your speedy trial rights, and we in fact have a trial scheduled, so we're more than ready to do that.

There would be a jury at the trial, twelve people on the jury, and you and your lawyer would be able to participate in the jury selection process. Do you understand that?

THE DEFENDANT: I do.

THE COURT: And the jury presumes you to be not guilty, and the government has the burden of proof in a criminal case, and that is proof beyond a reasonable doubt. The government has to prove its case against you by proof beyond a reasonable doubt, thereby overcoming the presumption of innocence, and they have to do that for every single juror because the jury's verdict has to be unanimous. Understand?

THE DEFENDANT: I do.

THE COURT: You have a right to confront the witnesses who are called against you, and that's done by your lawyer cross-examining them.

Do you understand that?

THE DEFENDANT: I do.

THE COURT: And you also have a right to

challenge any evidence that is presented by the government. You can do that at trial. You can also do it before the trial. In general, the way a person makes challenges to the constitutionality or legality or anything that has happened with their case is by making pretrial motions.

I know you know this because you did it, and then there is a magistrate judge who makes a decision, and if either side doesn't like the magistrate judge's decision, they can appeal it to me. I make a decision, and then if you don't like it and you're convicted, then you can take that up to a higher court, but with that exception that we talked about in the plea agreement.

Do you understand that you're giving up your right to make any such challenges?

THE DEFENDANT: Yes.

THE COURT: Okay. You at trial would have a right to present evidence on your own behalf if you so chose, including if you wanted to call witnesses who refused to come voluntarily or were not able to come voluntarily, I would make sure that you got a subpoena making them come to court because you have a constitutional right to present a case yourself if you want to.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Regardless of whether you call any

other witnesses or present any other evidence, you would have a right to testify, tell your side of the story to the jury. You wouldn't have to do that. If you decided that you wanted to remain silent, no one would comment on your silence in the presence of the jury, and the jury would not hold it against you in any way.

Do you understand?

THE DEFENDANT: Yes.

THE COURT: Any time you are in court, you have a right to be represented by a lawyer, and if you can't afford a lawyer, one is appointed to represent you at no cost.

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: So if you plead guilty, there is no trial. There is no appeal of your guilt. There is no -- I guess there is an appeal of that one issue, but other than that, it's final.

Do you understand?

THE DEFENDANT: Yes.

THE COURT: Ms. Atwal, do you have anything else on the rights?

MS. ATWAL: No, Your Honor.

THE COURT: Mr. MacLaughlin, the rights?

MR. MacLAUGHLIN: Not on the rights.

THE COURT: Okay. So now we do need to make sure you're guilty of the offense. We do not take a guilty plea from somebody who is not actually guilty.

So, Mr. MacLaughlin, would you inquire with respect to the factual basis? Is that okay with you, Mr. Hansmeier?

THE DEFENDANT: Yep.

MR. MacLAUGHLIN: Mr. Hansmeier, I propose simply to sort of follow along in the plea agreement here. I don't think we have to read it, but I'll ask you questions based on it.

So let's go back to September of 2010 or so. At that time, you and your codefendant in this case, John Steele, started doing business as Steele Hansmeier. That was a law firm, correct?

THE DEFENDANT: That's correct.

MR. MacLAUGHLIN: And your business model was, you have clients, right?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: And they had copyrighted material?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: They hired you guys to go out and monitor the Internet to see who was going to sites to steal that stuff?

THE DEFENDANT: Correct.

MR. MacLAUGHLIN: And when you found out that there were people stealing it, you filed lawsuits naming John Does around the country?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: And then you went to the judge, and you said, Judge, we've got this case. We've got John Does. We don't know who they are. Please give us authorization to serve subpoenas on ISPs, Internet service providers, so we can figure out who those people are?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: Okay. So that went on for a while. Then after, when you found out who they were, you would write them letters, call them and say you have to pay us money to settle this or we're going to sue you?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: Okay. So it kind of took a turn. According to the plea agreement in April of 2011, it says here --

THE COURT: The amount was about $3,000? That was about the price that people were willing to pay --

THE DEFENDANT: Yes.

THE COURT: -- not to have you sue them or have it go public?

THE DEFENDANT: Yes.

THE COURT: Okay.

MR. MacLAUGHLIN: And that amount varied a bit over time, right?

THE DEFENDANT: Case dependent, yes.

MR. MacLAUGHLIN: So then in April of 2011, let's go over to page 3. It says here that this took a bit of a turn. It says here that Hansmeier and Steele caused somebody named P. H., and that was your brother Peter Hansmeier, correct?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: To upload their clients' pornographic movies to BitTorrent websites; is that correct?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: And one of those BitTorrent websites, for example, was one called the Pirate Bay?

THE DEFENDANT: That's correct.

MR. MacLAUGHLIN: And you and Mr. Steele knew that these were websites that people went to to steal stuff. That was really the reason they were there?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: Okay. And you continued to sue people even with respect to files that you had put up on the Pirate Bay and similar sites, correct?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: Okay.

THE COURT: Just a second. Do you want a glass of water?

THE DEFENDANT: No thanks.

MS. ATWAL: Thank you, Your Honor.

THE COURT: Thank you, Ms. Atwal.

MR. MacLAUGHLIN: All right. So let's continue. We've got 2011 going on. When we get to late 2011, November of 2011, you and Mr. Steele decide to stop doing business as Steele Hansmeier, correct?

THE DEFENDANT: Correct.

MR. MacLAUGHLIN: And what you do is, you establish another firm called Prenda Law, right?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: And you recruit a Chicago attorney named Paul Duffy to act as sort of the titular head of that law firm, right?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: And it says here over at page 4 that you and Mr. Steele continued, though, to exert de facto control over Prenda Law, including the primary direction of its employees and the dispensation of its finances.

Was that true?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: Okay. So we have got Prenda Law that you guys are continuing to control. We also have entities that are being set up. It says here you guys set up various entities that ultimately acted as plaintiffs in these cases, right?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: And those entities included AF Holdings and Ingenuity 13 LLC.

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: Also Guava LLC and L W Systems and I think a few others, right?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: And what it says here is that even though these were set up in an obscure sort of way, for example Ingenuity 13 and AF Holdings were set up in a Caribbean country, right?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: Even though that all happened it says here that you and Mr. Steele surreptitiously controlled those entities.

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: Is that true?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: Sorry, Kristine.

So then we get to May of 2012, and it says here

that around that time, you guys started shooting your own porn movies. Did that happen?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: In fact it says here that on three separate occasions in Chicago, Miami and Las Vegas, you guys sort of hired people to be in these movies so you could shoot them, right?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: And then you have those movies as well put up on Pirate Bay and similar sites; is that true?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: All right. So even after that, you continue to bring lawsuits, including based on movies that you guys had shot, right?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: And you continued to allege --

THE COURT: That's you and Mr. Steele, right?

THE DEFENDANT: Correct.

MR. MacLAUGHLIN: Mr. Hansmeier, you continued to allege in the complaints that the people downloading these movies were downloading them without authorization or consent of the copyright holder, right?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: Even though in a sense the

copyright holder was you, and you and Mr. Steele and your brother had uploaded the content to be stolen, right?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: Okay. So I think sort of the bottom line on the BitTorrent piece of this case is on page 5. I'm going to read it into the record and make sure you agree with this.

One more step. You would file the complaint, and then you would file a motion for early discovery, right?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: You would tell the judge, as you have all along, we've got this complaint. It's against John Does, but we don't know who the John Does are?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: And so we're giving you a motion to give us the authority to do early discovery, and it says here, In each of the lawsuits and the accompanying ex parte motions for early discovery, Hansmeier and Steele concealed from the Court that they, A, uploaded their clients' movies to BitTorrent websites; B, filmed their own pornographic movies in order to upload them to BitTorrent websites; and, C, that you guys really surreptitiously controlled the plaintiffs and thus had a significant personal stake in the litigation.

You did conceal those things from the courts,

both in the complaints and in the motions for early discovery?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: And it says here you guys both knew that these facts were material to the courts' decisions whether to permit early discovery, and you did know that, right?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: Then after that, you would sometimes get the subpoenas. Sometimes courts pushed back, to be fair, but you did get subpoena authority?

THE DEFENDANT: Yep.

MR. MacLAUGHLIN: You would go serve them the ISPs?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: You would find out who the subscribers were for the IP addresses that were going to the Pirate Bay?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: And then you would send them letters and try to settle cases?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: Okay. So let's go on here. There is another aspect of the case involving hacking. I'm at page 5. I'm going to go over to page 6.

A little later in the time frame of the case, you guys started running into a few more difficulties than you wanted to, getting subpoenas in the BitTorrent cases, right?

THE DEFENDANT: May I confer with my counsel real quick?

MR. MacLAUGHLIN: Of course.

**(Defendant confers with counsel.)**

MS. ATWAL: Thank you, Your Honor.

MR. MacLAUGHLIN: Let me get at this a different way. Later on in the case, you guys filed some hacking cases, which is to say, complaints that said somebody is hacking into our computer systems?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: And according to this --

THE COURT: And again, that's you and Mr. Steele?

THE DEFENDANT: That's correct.

MR. MacLAUGHLIN: And according to this agreement, essentially you were suing people for hacking who you really knew were just downloading pornography, going to places like Pirate Bay?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: Okay. And so the allegation that there was hacking really wasn't true?

THE DEFENDANT: Correct.

MR. MacLAUGHLIN: Okay. That's what the complaint said, but that wasn't really what happened, right?

THE DEFENDANT: Correct.

MR. MacLAUGHLIN: In addition there is another aspect of this that's in the factual basis. In these hacking cases, Mr. Hansmeier, at least in some of them, you would go to the defendant and get the defendant to agree to be sued?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: The defendant would know that they were going to be sued and that you would let them not pay a settlement payment if they agreed to be sued and that you would dismiss the case after you got discovery?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: Okay. And I take it you knew that that wasn't kosher, right?

THE COURT: Not according to law?

MR. MacLAUGHLIN: What's that?

THE COURT: Not according to law?

MR. MacLAUGHLIN: Yes. I mean, if the judges had known that the allegations were false and that the defendants had agreed to be sued, you wouldn't have gotten any subpoena authority from the judges in the hacking cases?

THE DEFENDANT: Yes.

THE COURT: Do you have any questions about that, Mr. Hansmeier? Did you understand the question?

THE DEFENDANT: I did.

THE COURT: Okay.

MR. MacLAUGHLIN: Okay. Then we get into the money laundering part of the case, and I'm going to make this simple. In 2012 you and Mr. Steele set up a company called Under the Bridge Consulting.

THE DEFENDANT: Correct.

MR. MacLAUGHLIN: And Under the Bridge Consulting received money from Prenda Law?

THE DEFENDANT: It did.

MR. MacLAUGHLIN: And it received money from Prenda Law that came from settlement activity that was the result of the facts that we just went over?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: And it says here that one of the reasons that you set that up and sent it money and then had it send you guys money was to conceal or disguise the nature, source, ownership and control of the proceeds?

THE DEFENDANT: Correct.

MR. MacLAUGHLIN: Okay. Your Honor, I think I don't have anything else.

THE COURT: Okay. What part of this happened in

Minnesota? Were you headquartered here, or were you operating out of here?

THE DEFENDANT: Yes, Your Honor. There were, at any given point in time, there were essentially two offices, one where Mr. Steele would be running his part of the operation, and there would be an office here in Minneapolis as well where I was, and primarily we did the legal work in Minneapolis, so draft, you know, motions to quash or whatever.

THE COURT: Some part of the conspiracy took place here?

THE DEFENDANT: Yes.

THE COURT: In Minnesota?

THE DEFENDANT: Yes.

THE COURT: Conspiracies, I should say. Did anybody force you to commit the offenses?

THE DEFENDANT: No.

THE COURT: You did it of your own free will, and you're offering to plead guilty of your own free will?

THE DEFENDANT: Yes.

THE COURT: Ms. Atwal, anything else?

MS. ATWAL: No, Your Honor.

THE COURT: Mr. Hansmeier, your full name is Paul R. Hansmeier?

THE DEFENDANT: Correct.

THE COURT: How do you plead to Count 1 of the indictment on file against you charging you with conspiracy to commit mail fraud and wire fraud in violation of Title 18 United States Code Section 1349, guilty or not guilty?

THE DEFENDANT: Guilty.

THE COURT: And how do you plead to Count 17 charging you with conspiracy to commit money laundering in violation of Title 18 United States Code Section 1956(h), guilty or not guilty?

THE DEFENDANT: Guilty.

THE COURT: Okay. I'm satisfied you're actually guilty and you know what you're doing today, so I accept your pleas of guilty. The next thing that happens is, the probation department will prepare a presentence investigation report. Cooperate with them as they put it together and then also read it over when they're all finished, with your lawyer obviously.

If there are any mistakes, probably you can get those worked out ahead of time. If not if there is a disagreement, bring it to my attention at sentencing. Do you have any questions about what is going to happen?

THE DEFENDANT: I don't.

THE COURT: Okay. So now that you have pled guilty, let me just take a quick look. I did look at the bail report ahead of time, but I just want to make sure

that I, that my memory is correct. What I'm hoping is I didn't look at it and then leave it out of the file. Just a second here.

No violations. Is that consistent with the government's view?

MR. MacLAUGHLIN: Yes, Your Honor.

THE COURT: I'm inclined to leave him on the same terms and conditions --

MR. MacLAUGHLIN: No objection.

THE COURT: -- pending sentencing. Okay. All right. You're on the same terms and conditions that you have been on up to today's date pending sentencing. Make sure you keep in contact with your lawyer, and we'll see you back here at the time of sentencing.

THE DEFENDANT: Thank you, Your Honor.

MR. MacLAUGHLIN: Your Honor, I do have one more little thing I forgot to go over with Mr. Hansmeier.

THE COURT: Mr. MacLaughlin.

MR. MacLAUGHLIN: Maybe not so little.

Mr. Hansmeier, a little over two weeks ago we made a plea offer to you. Do you remember that?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: And in that plea offer, we agreed to recommend not two points off for acceptance. We agreed to move for that third point two weeks ago.

THE DEFENDANT: Correct.

MR. MacLAUGHLIN: And there were also a couple other things that got worse in the last two weeks, right?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: So the plea agreement we offered you two weeks ago is worse than the plea agreement you're pleading to here today?

THE COURT: What? I don't know what the truth is.

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: Okay. I just want to make sure you were aware of that plea offer?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: Ms. Atwal conveyed it to you?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: Ms. Atwal sent an e-mail saying Mr. Hansmeier has rejected the plea. Did you authorize her to send that?

THE DEFENDANT: Yes.

MR. MacLAUGHLIN: Okay. Nothing else, Your Honor.

THE COURT: There is new case law that requires Mr. MacLaughlin to go through that.

THE DEFENDANT: I see.

THE COURT: Ms. Atwal, anything?

MS. ATWAL: No, Your Honor. Thank you.

THE COURT: All right. We're in recess.

THE CLERK: All rise.

**(Court was adjourned.)**

* * *

I, Kristine Mousseau, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Certified by: s/ Kristine Mousseau, CRR-RPR
Kristine Mousseau, CRR-RPR